## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **SHARI LINDENBAUM**, individually and on behalf of all others similarly situated, | Case No. : 1:17-cv-1991 |
| *Plaintiff*, | **CLASS ACTION COMPLAINT** |
| *v.* | **DEMAND FOR JURY TRIAL** |
| **LYFT, INC.**, a Delaware corporation, | |
| *Defendant*. | |

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Shari Lindenbaum ("Lindenbaum" or "Plaintiff") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant Lyft, Inc. ("Lyft") to: (1) stop Lyft's practice of sending unsolicited text messages using an "automatic telephone dialing system" ("ATDS") to cellular telephones without prior express consent; (2) stop Lyft from calling consumers who are registered on the National Do Not Call Registry; and (3) obtain redress for all persons injured by Lyft's conduct. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

### PARTIES

1.      Plaintiff Shari Lindenbaum is a natural person and resident of Cuyahoga County, Ohio.

2.      Defendant Lyft is a corporation organized and existing under the laws of the State of Delaware. Defendant systemically and continuously conducts business

throughout this District, the State of Ohio, and the United States, and is registered with the Ohio Secretary of State. Lyft maintains its principal offices at 185 Berry St., Suite 5000 San Francisco, California 94107 and can be served through its registered agent, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, as the action arises under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (the "TCPA"), which is a federal statute.

4.      This Court has personal jurisdiction over Defendant because it maintains a significant presence in this District, solicits significant business in this District, has entered into business contracts in this District, and a significant portion of the unlawful conduct alleged in this Complaint occurred in and/or was directed to this District.

5.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant conducts a significant amount of business within this District and because the wrongful conduct giving rise to this case occurred in and/or was directed to this District. Venue is additionally proper because Plaintiff resides in this District.

## COMMON ALLEGATIONS OF FACT

6.      Defendant Lyft is a transportation network company based in San Francisco, California. It develops, markets and operates the Lyft car transportation mobile app. Lyft currently operates in approximately 300 U.S. cities, and provides 18.7 million rides a month.

7.      Lyft promotes and licenses mobile-based software the ("Lyft App") to connect commercial drivers with passengers.

8.      Pursuant to its license agreement with the drivers, Lyft generates income by taking a portion of the money that the passengers pay to the drivers.

9.      To utilize Lyft, a consumer must first download the Lyft App and create an account. Importantly, a consumer must provide a cellular telephone number to Lyft in order to utilize the service.[1]

10.     A consumer then uses the Lyft App to request a ride from a commercial driver.

11.     Lyft sends autodialed text messages to the phone number they have on file alerting a consumer of the driver's name and vehicle information as well as when the driver has arrived for a pickup.[2]

12.     In an effort to market its commercial ride services and to maximize revenue by increasing customer usage, Lyft sends autodialed text messages to cellular telephones.

13.     Unfortunately for consumers, Lyft casts its marketing net too wide. That is, in an attempt to promote its business, Lyft conducted (and continues to conduct) a wide-scale telemarketing campaign that features the sending of repeated **unsolicited** text messages to consumers' cellular telephones—without consent, all in violation of the TCPA.

14.     As Congress recognized:

---

[1] https://help.lyft.com/hc/en-us/articles/214216237
[2] https://help.lyft.com/hc/en-us/articles/213584088-How-to-get-picked-up-as-a-passenger

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers…. Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.[3]

15.     Senator Larry Pressler, one of the original drafters of the TCPA, explained the need for the TCPA by observing that "[u]nlike other communications media, the telephone commands our instan[t] attention. Junk mail can be thrown away. Television commercials can be turned off. The telephone demands to be answered." 137 Cong. Rec. S18785 (daily ed. Nov. 27, 1991) (statement of Sen. Pressler).

16.     As explained by the Federal Communications Commission ("FCC")[4], the TCPA requires "*prior express written consent* for all autodialed or prerecorded telemarketing calls to wireless numbers and residential lines." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG No. 02-278, FCC 12-21, 27 FCC Rcd. 1830 ¶ 2 (Feb. 15, 2012).

17.     Yet, in violation of this rule, Lyft fails to obtain any prior express written consent to send text messages to consumers' cellular telephone numbers.

18.     Indeed, the FCC has explicitly noted that any such consent must be given by the party that is actually called, even if the caller intends to call another party:

> [T]he TCPA requires the consent not of the intended recipient of a call, but of the current subscriber (or non-subscriber customary user of the phone) and that caller best practices can facilitate detection of reassignments before calls. We generally agree with commenters who oppose granting these requests that there are solutions in the marketplace to better inform callers of reassigned wireless numbers; that businesses

---

[3] Pub. L. No. 102-243 § 2(6, 12) (1991), codified at 47 U.S.C. § 227.
[4] The FCC is the federal agency given the administrative authority to interpret and enforce the TCPA. 47 U.S.C. § 227(B)(2).

should institute new or better safeguards to avoid calling reassigned wireless numbers and facing TCPA liability; and that the TCPA requires consent from the actual party who receives a call.[5]

19.     More precisely, the FCC has stated:

when a caller chooses to make robocalls to a wireless number that may have been reassigned, it is the caller—and not the wireless recipient of the call—who bears the risk that the call was made without the prior express consent required under the statute.[6]

20.     The FCC has further noted that:

the TCPA does not prohibit calls to reassigned wireless numbers, or any wrong number call for that matter. Rather, it prescribes the method by which callers must protect consumers *if they choose* to make calls using an autodialer, a prerecorded voice, or an artificial voice. In other words, nothing in the TCPA prevents callers from manually dialing…If callers choose to use autodialers…they risk TCPA liability.[7]

21.     While some Lyft customers may elect to receive autodialed text messages, Lyft can send autodialed text messages to anyone in the U.S., even if they do not have any prior relationship with Lyft. Thus, as with Plaintiff, Lyft sends autodialed text messages to current subscribers of recycled cellular telephone numbers (many of whom do not have a relationship with Lyft) who have never consented to receiving such autodialed text messages.

22.     Lyft fails to update its databases to account for circumstances where its users have deactivated or relinquished the phone number that they previously provided to the ride service.

---

[5] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG No. 02-278, WC No. 07-135, FCC 15-72, 30 FCC Rcd. 7999-8000 ¶ 72 (July 10, 2015).
[6] *Id.* at 8010 n. 312.
[7] *Id.* at 8006 ¶ 84 (emphasis in original).

23.     For various reasons, cellular telephone subscribers deactivate and relinquish their cellular telephone numbers. Once deactivated, the cellular telephone carrier reassigns the number to another subscriber – a practice known as "recycling." Recycling times (i.e., the time between deactivation and reassignment) vary across carriers, generally ranging from 30 days to six months depending on location and demand. During the recycling period, the cellular telephone number is considered disconnected.

24.     Relevant here, when a Lyft user deactivates their phone number, and the number eventually gets reassigned to a new consumer, Lyft continues to send multiple autodialed text messages to the same number, and its new owner, without the new owner's consent.

25.     In some instances (but not all), the prior owner of a recycled telephone number may have consented to receiving autodialed text messages from Lyft. But, even if the prior owner consented, that consent does not transfer to the recycled cellular telephone number's new owner. Ultimately, new owners of recycled cellular telephone numbers are given no choice in receiving, addressing, and paying for Lyft's autodialed text messages.

26.     The mobile marketing industry is aware of cellular telephone number recycling and, in particular, the risk associated with placing of autodialed and/or prerecorded calls to non-consenting recycled numbers. To help mobile marketers navigate regulatory compliance, the Mobile Marketing Association ("MMA")[8] publishes

---

[8] The MMA is a global trade organization that issues codes of conduct, best practices, guidelines, rules and instructions for companies engaged in mobile marketing. Its U.S. Consumer Best Practices for Messaging are based on accepted industry practices,

specific guidelines based on accepted industry practices for all mobile marketers. In its

October 2012 U.S. Consumer Best Practices for Messaging ("Messaging Best

Practices"), the MMA recommends that mobile marketers, such as Lyft:

> have appropriate and effective systems and processes for managing
> deactivation and recycled number information. These systems and
> processes should be designed to ensure that mobile content programs
> subscribed to by previous holders of a specific phone number do not
> continue to be delivered or billed to a subsequent holder of that number
> when it is reassigned.[9]

The MMA further advises mobile marketers to "process deactivation information within

three business days of receipt."[10]

27.     According to the MMA's Messaging Best Practices,

> [a] subscriber must be able to stop participating and receiving messages
> from any program by sending STOP to the short code used for that
> program. . . END, CANCEL, UNSUBSCRIBE or QUIT should also be
> opt-out key words for all programs; however content providers should
> feature the word STOP in their advertising and messaging. . . When sent,
> these words cancel the subscriber's previous opt-in for messaging.

Further, "[t]he content provider must record and store all opt-out transactions."[11]

28.     CTIA[12] similarly advises that standards for processing opt-out messages in

text messaging programs:

> Functioning opt-out mechanisms are crucial for all text messaging
> programs. Programs must always acknowledge and respect customers'
> requests to opt out of programs

---

common wireless carrier policies and regulatory guidance. With over 800 members, the
MMA is the preeminent source for mobile marketing information and expertise.
[9] https://www.ctia.org/docs/default-source/default-document-library/industry-best-practices.pdf
[10] *Id.*
[11] *Id.*
[12] The CTIA is an international non-profit organization that audits and enforces the rules
surrounding carrier-based text messaging programs. Together, the MMA and the CTIA
establish and publish guidelines setting forth accepted industry best practices for mobile
marketing.

…
Short code programs must respond to, at a minimum, the universal keywords STOP, END, CANCEL, UNSUBSCRIBE, and QUIT by sending an opt-out message and, if the user is subscribed, by opting the user out of the program. Subsequent text, punctuation, capitalization, or some combination thereof must not interfere with opt-out keyword functionality.[13]

29.     CTIA additionally provides guidance on standards for notifying cellular telephone users about their ability to opt-out of text message programs:

Recurring-messages programs must also display opt-out instructions at program opt-in and at regular intervals in content or service messages, at least once per month. Opt-out information must be displayed on the advertisement. A program may deliver one final message to confirm a user has opted out successfully, but no additional messages may be sent after the user indicates a desire to cancel a short code program.[14]

30.     As detailed below, Defendant's text messages provide no information on opting out or contacting Defendant.

31.     In response to the liability risk associated with recycled numbers, numerous commercially available services exist to help companies, such as Lyft, that place autodialed and/or prerecorded calls, identify recycled numbers and non-consenting cellular subscribers. For instance, companies such as Infutor, Nextmark List, and Contact Center Compliance advertise their ability to instantly identify and flag disconnected telephone numbers from cellular telephone number data lists on a recurring basis (such as weekly or monthly). This type of service can identify disconnected numbers before they

---

[13] *See,* CTIA's Short Code Monitoring Program, *Short Code Monitoring Handbook*, Version 1.6, effective July 16, 2016, page 4, available at https://www.usshortcodes.com/info/static/docs/CTIA%20Short%20Code%20Monitoring%20Handbook%20v1.5.2.pdf
[14] *Id.*

are recycled, thereby alerting mobile marketers that any consent associated with those telephone numbers has been terminated.

32.     Despite the FCC's ruling, the industry guidelines, the commercial availability of programs that help callers filter out recycled numbers, and the obvious lack of consent associated with recycled numbers, Lyft failed (and continues to fail) to take the necessary steps to ensure that their autodialed text messages are sent only to consenting recipients. That is true even though Lyft knows its automated system sends unsolicited text messages to individuals about accounts that don't belong to them.

33.     Rather, in an effort to increase revenue and skirt additional costs, Lyft simply treats the new recycled cellular telephone number owner as if he or she were the previous owner. As such, if the previous owner gave consent to receive Lyft's autodialed text messages, Lyft continue to treat that consent as the consent of the new (unassociated) owner. New owners are then forced to incur the cost and bother of receiving Lyft's autodialed text messages. Lyft often disregards the issue of consent when contacting individuals via autodialed text messages to their cellular telephones.

34.     If the cellular telephone number is associated with its previous owner's Lyft account, the new cellular subscriber has no way of accessing that account (belonging to the previous owner) to opt out of receiving Lyft's text messages.

**A.  Bulk SMS Marketing**

35.     In recent years, marketers who have felt stymied by federal laws limiting solicitation by telephone, fax machine, and e-mail have increasingly looked to alternative technologies through which to send bulk advertisement and/or solicitation messages cheaply.

36.     Text messages, like the ones sent in the instant action, are considered calls under the TCPA. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14115, ¶ 165 (July 3, 2003); *see also Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 954 (9th Cir. 2009) (noting that text messaging is a form of communication used primarily between telephones and is therefore consistent with the definition of a "call").

37.     Bulk text messaging, or SMS marketing, has emerged as a new and direct method of communicating and soliciting consumer business. The term "Short Message Service" or "SMS" is a messaging system that allows cellular telephone subscribers to use their cellular telephones to send and receive short text messages, usually limited to 160 characters. An SMS message is a text message call directed to a wireless device through the use of the telephone number assigned to the device.

38.     When an SMS message call is successfully made, the recipient's cellular telephone alerts him or her that a message has been received. As cellular telephones are inherently mobile and are frequently carried on their owner's person, calls to cellular telephones, including SMS messages, may be received by the called party instantaneously virtually anywhere worldwide.

**B.  Defendant Transmits Text Messages to Consumers Who Do Not Want Them**

39.     Lyft sends text messages to consumers' cellular telephones in an attempt to solicit business.

40.     In sending these promotional text messages, Lyft has taken no steps to acquire the oral or written prior express consent of Plaintiff, or the other members of the class who received the unsolicited autodialed text messages.

41.     Lyft made, or had made on its behalf, the same (or substantially the same) unsolicited text message calls *en masse* to hundreds or thousands of cellular telephone numbers owned or utilized by class members.

42.     In sending the unsolicited text messages at issue in this Complaint, Lyft utilized an ATDS. Specifically, the hardware and software used by Lyft (or its agent) has the capacity to store, produce, and dial random or sequential numbers, and/or receive and store lists of telephone numbers, and to dial such numbers, *en masse,* in an automated fashion without human intervention. Lyft's ATDS includes features substantially similar to a predictive dialer, inasmuch as it is capable of making numerous text message calls simultaneously (all without human intervention).

43.     The unsolicited text messages, however, are not simply sent to individuals who never provided consent. They are also completely automated and generic in nature, thus providing further evidence that they are sent automatically, and not manually. Moreover, Lyft provides more than 1 million rides per day.[15]  Each of those rides is a triggering event for one or more automated text messages. It defies logic to suggest that Lyft is manually sending 1 million text messages per day.

44.     Moreover, the cellular telephone numbers at issue in this case are likely associated with a Lyft account, but the new cellular subscriber has no way of accessing that account to opt out of receiving Lyft's autodialed text messages.

45.     Lyft knows or should know that its autodialed text messages are sent to non-consenting cellular telephone number subscribers. Ultimately, Lyft is responsible for verifying cellular telephone number ownership and obtaining consent before sending

---

[15] *See* https://blog.lyft.com/posts/one-million-rides-a-day

11

autodialed text messages to cellular telephone subscribers. Even with prior cellular subscriber consent, Lyft is liable under the TCPA for sending autodialed text messages to cellular telephone numbers reassigned to new subscribers without the new subscriber's consent. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 641 (7th Cir. 2012) (under the TCPA, "[c]onsent to call a given number must come from its current subscriber," not its prior subscriber); *Breslow v. Wells Fargo*, 755 F. 3d 1265, 1267 (11th Cir. 2014) (consent from "called party" means consent from the person subscribing to the called number at the time the call was made, not the former subscriber); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG No. 02-278, FCC 03-153, 18 FCC Rcd. 14014 ¶ 123 (July 3, 2003) ("we reject proposals to create a good faith exception for inadvertent autodialed or prerecorded calls to wireless numbers…").

46.    Given the multitude of readily available, commercially feasible resources to identify such consumers, Lyft had ready means to identify those consumers and to obtain their prior express consent before sending autodialed text messages to their cellular telephones.

47.    Lyft was, and is, aware that its unsolicited autodialed text messages were, and are, unauthorized as it fails to obtain prior express written consent before sending those text messages to consumers. Ultimately, consumers are forced to bear the costs of receiving these unsolicited autodialed text messages.

48.    Telemarketers can easily and inexpensively avoid calling consumers who are registered on the National Do Not Call Registry by "scrubbing" their call lists against the National Do Not Call Registry database. The scrubbing process identifies those

12

numbers on the National Do Not Call Registry, allowing telemarketers to remove those numbers and ensure that no calls are placed to consumers whom opt-out of telemarketing calls.

49.    To avoid violating the TCPA by calling registered numbers, telemarketers must scrub their call lists against the Registry at least once every thirty-one days. *See* 16 C.F.R. § 310.4(b)(3)(iv).

50.    There are numerous third party services that will scrub the call lists for a telemarketer to segment out landline and cellular telephone numbers, since the consent standards differ depending on what type of phone a telemarketer is calling.[16] Indeed, one service notes that they can:

> Instantly verify whether a specific phone number is wireless or wireline to learn if TCPA regulations apply – and verify the identity of the current subscriber to determine if they are the same party who provided you with consent.[17]

51.    By sending the unsolicited text messages at issue in this Complaint, Lyft caused Plaintiff and the other members of the Class actual harm and cognizable legal injury. This includes the aggravation and nuisance and invasions of privacy that result from the sending and receipt of such text messages, a loss of value realized for the monies consumers paid to their carriers for the receipt of such text messages, and a loss of the use and enjoyment of their phones, including wear and tear to the related data, memory, software, hardware, and battery components, among other harms.

---

[16] *See e.g.* http://www.dncsolution.com/do-not-call.asp;
http://www.donotcallprotection.com/do-not-call-compliance-solutions-1;
http://www.mindwav.com/tcpa_compliance_solution.asp;
[17] https://www.neustar.biz/services/tcpa-compliance

52.     In response to Lyft's unlawful conduct, Plaintiff filed this action seeking an injunction requiring Lyft to cease all unsolicited text messaging activities and an award of actual or statutory damages to the members of the Class under the TCPA, together with costs and reasonable attorneys' fees.

**FACTS SPECIFIC TO PLAINTIFF SHARI LINDENBAUM**

53.     Plaintiff is the registered account owner of a cellular telephone number, 216-xxx-1471.

54.     The 216-xxx-1471 number has been registered on the National Do Not Call Registry since August 25, 2007.

55.     Starting on March 20, 2017, Plaintiff received a series of unsolicited, autodialed text messages from Lyft.

56.     All of the unsolicited, autodialed text messages from Lyft were sent from 215-516-7428, a number registered to, belonging to, or utilized by Lyft.

57.     On March 20, 2017 at 9:38 am, Plaintiff received five unsolicited autodialed text messages from Lyft on the 216-xxx-1471 cellular telephone number from 215-516-7428, a number registered to, belonging to, or utilized by Lyft.

58.     The first March 20, 2017 text message stated, "Lyft accommodates service animals and foldable wheelchairs. If you need a vehicle with a ramp or lift, visit http://lft.to/access to connect to local services."

59.     The second March 20, 2017 text message stated, "Your Lyft driver, Mene, is here! Look for the Silver Toyota Camry."

14

60.    The third March 20, 2017 text message stated, "You were charged a $5 fee for missing your Lyft ride. Sorry it didn't work out! Here's our cancellation policy http://lft.to/1Lz9JFu."

61.    The fourth March 20, 2017 text message again stated, "Lyft accommodates service animals and foldable wheelchairs. If you need a vehicle with a ramp or lift, visit http://lft.to/access to connect to local services."

62.    The fifth March 20, 2017 text message stated, "Your Lyft driver, Umar, is here! Look for the Silver Mazda 6."

63.    The following are screenshots taken from Plaintiff's cellular telephone displaying the aforementioned messages:



64.     On May 18, 2017, starting at 9:00 pm, Plaintiff received two additional unsolicited autodialed text message from Lyft on the 216-xxx-1471 cellular telephone number from 215-516-7428, a number registered to, belonging to, or utilized by Lyft.

65.     The first May 18, 2017 text message stated, "Lyft accommodates service animals and foldable wheelchairs. If you need a vehicle with a ramp or lift, visit http://lft.to/access to connect to local services."

66.     The second May 18, 2017 text message stated, "Your Lyft driver, Kyrian, is here! Look for the Red Chevrolet Cruze."

67.     The following is a screenshot taken from Plaintiff's cellular telephone displaying the aforementioned messages:



68.     On June 5, 2017, starting at 6:48 pm, Plaintiff received two additional unsolicited autodialed text message from Lyft on the 216-xxx-1471 cellular telephone number from 215-516-7428, a number registered to, belonging to, or utilized by Lyft.

69.     The first June 5, 2017 text message stated, "Lyft accommodates service animals and foldable wheelchairs. If you need a vehicle with a ramp or lift, visit http://lft.to/access to connect to local services."

70.     The second June 5, 2017 text message stated, "Your Lyft driver, Thomas, is here! Look for the Blue Hyundai Sonata."

71.     The following is a screenshot taken from Plaintiff's cellular telephone displaying the aforementioned messages:



72.     On June 6, 2017, starting at 10:26 am, Plaintiff received two additional unsolicited autodialed text message from Lyft on the 216-xxx-1471 cellular telephone number from 215-516-7428, a number registered to, belonging to, or utilized by Lyft.

73.     The first June 6, 2017 text message stated, "Lyft accommodates service animals and foldable wheelchairs. If you need a vehicle with a ramp or lift, visit http://lft.to/access to connect to local services."

74.     The second June 6, 2017 text message stated, "Your Lyft driver, Tom, is here! Look for the Silver Pontiac Grand Prix."

75.     The following is a screenshot taken from Plaintiff's cellular telephone displaying the aforementioned messages:



76.     On June 17, 2017, starting at 12:38 pm, Plaintiff received four additional unsolicited autodialed text message from Lyft on the 216-xxx-1471 cellular telephone number from 215-516-7428, a number registered to, belonging to, or utilized by Lyft.

77.     The first June 17, 2017 text message stated, "Lyft accommodates service animals and foldable wheelchairs. If you need a vehicle with a ramp or lift, visit http://lft.to/access to connect to local services."

78.     The second June 17, 2017 text message also stated, "Lyft accommodates service animals and foldable wheelchairs. If you need a vehicle with a ramp or lift, visit http://lft.to/access to connect to local services."

79.     The third June 17, 2017 text message stated, "We found you a better driver who's already on the way." Check the Lyft app for updates."

80.     The fourth June 17, 2017 text message stated, "Your Lyft driver, Mark, is here! Look for the Silver Cadillac CTS."

81.     The following are screenshots taken from Plaintiff's cellular telephone displaying the aforementioned messages:



82.     The text messages at issue were unquestionably sent by Lyft.

83.     Specifically, the text messages at issue all identify Lyft by name, provide links to Lyft's website, or mention the Lyft app.

84.     Plaintiff has never provided her prior express written consent to Lyft to receive autodialed text messages on the 216-xxx-1471 number.

85.     The 216-xxx-1471 number is likely associated with another person's Lyft account, but Plaintiff has no way of accessing that account to opt out of receiving Lyft's autodialed text messages.

86.     Defendant failed to obtain any prior express consent that included, as required by 47 C.F.R. § 64.1200(f)(8)(i) a "clear and conspicuous" disclosure informing the person signing that:

(A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and

(B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

87.　　By sending unauthorized text messages as alleged herein, Lyft has caused consumers actual harm in the form of annoyance, nuisance, and invasion of privacy. In addition, the text messages disturbed Plaintiff's use and enjoyment of her phone, in addition to the wear and tear on the phone's hardware (including the phone's battery) and the consumption of memory on Plaintiff's phone.

88.　　In order to redress these injuries, Plaintiff, on behalf of herself and the other members of the Class, brings suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, which prohibits unsolicited voice and text calls to cellular telephones.

89.　　On behalf of the Class, Plaintiff seeks an injunction requiring Lyft to cease all unsolicited text messaging activities, and to further cease placing calls or sending text messages to phone numbers listed on the National Do Not Call Registry, and an award of actual or statutory damages to the class members, together with costs and reasonable attorneys' fees.

## CLASS ALLEGATIONS

90.　　Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and all others similarly situated and seeks certification of the following two Classes:

**Autodialed No Consent Class:** All persons in the United States who from a date four years prior to the filing of the initial complaint to the present: (1) Defendant (or a third person acting on behalf of Defendant) sent text messages; (2) to the person's cellular telephone number; (3) using an ATDS; (4) for non-emergency purposes; and (5) for whom Defendant lacked prior express consent to send autodialed text messages to that cellular telephone number at the time the message was sent.

**Do Not Call Registry Class:** All persons in the United States who: (1) Defendant (or a third person acting on behalf of Defendant) called more than one time on his/her cellphone; (2) within any 12-month period (3) where the cellphone number had been listed on the National Do Not Call Registry for at least thirty days; (4) for the purpose of selling Defendant's products and services; and (5) for whom Defendant lacked prior express consent to send autodialed text messages to that cellular telephone number at the time the message was sent.

91.      The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons. Plaintiff anticipates the need to amend the definitions of the Classes following class discovery, including discovery revealing the manner by which Defendant claims they obtained prior express consent to place autodialed and/or pre-recorded calls to the Plaintiff.

92.      **Numerosity**: The exact number of members within the Classes is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendant has placed unsolicited calls to

hundreds or thousands of consumers who fall into the definition of the Classes. Members of the Classes can be identified through Defendant's records.

93.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's uniform wrongful conduct, namely their unauthorized telemarketing calls. Plaintiff is a member of the Classes defined herein, and if Plaintiff is able to recover for the claims set forth in this Complaint then the other Class Members will have a right to recover as well.

94.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions, including class actions under the TCPA and related statutes. Plaintiff has no conflicts with or interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

95.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

a)  Whether Defendant's conduct constitutes a violation of the TCPA;

b)  Whether Defendant utilized an automatic telephone dialing system to place calls to members of the Classes;

c)  Whether members of the Classes are entitled to statutory and treble damages based on the willfulness of Defendant's conduct;

d)  Whether Defendant obtained prior express consent to contact any class members;

e) Whether Defendant's calls constitute telemarketing or were dual purpose messages, and

f) To the extent Defendant's conduct does not constitute telemarketing, whether Defendant obtained prior express oral consent to contact any class members.

96. **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendant's misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

97. Adequate notice can be given to the members of the Classes directly using information maintained in Defendant's records or through notice by publication.

**FIRST CAUSE OF ACTION**
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff and the Autodialed No Consent Class)**

98.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

99.     Defendant and/or their agent placed unsolicited autodialed calls to cellular telephone numbers belonging to Plaintiff and the other members of the Autodialed No Consent Class using equipment that, upon information and belief, had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and/or receive and store lists of phone numbers, and to dial such numbers, *en masse*, without human intervention. The telephone dialing equipment utilized by Defendant and/or its agent, which is substantially similar to a predictive dialer, dialed numbers from a list, or dialed numbers form a database of telephone numbers, in an automatic and systematic manner.

100.    These calls were made *en masse* and without the prior express written or oral consent of the Plaintiff and the other members of the Autodialed No Consent Class to receive such calls.

101.    To the extent prior written express consent was required, Defendant failed to obtain prior written express consent that disclosed to the consumer that agreeing to receive autodialed and/or pre-recorded calls was not a condition of purchase or use of any goods or service or that the consumer was agreeing to receive calls with the use of an ATDS or similar technology. No oral consent was provided either.

102.    To the extent Defendant's agent placed the calls at issue, Defendant's agent acted with actual or apparent authority and/or in accordance with a contract between

Defendant and its agent. Defendant's agent acted under Defendant's control and for Defendant's benefit and/or with Defendant's knowledge and approval. Defendant controlled its agent and knew about, and received the benefits of, the agent's calling activities. Defendant ratified the agent's conduct with respect to the placing of such calls.

103.    Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's conduct, Plaintiff and the other members of the Autodialed No Consent Class are each entitled to, under 47 U.S.C. § 227(b)(3)(B), a minimum of $500.00 in damages for each violation of such act.

104.    In the event that the Court determines that Defendant's conduct was wilful and knowing, it may, under 47 U.S.C. § 227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Autodialed No Consent Class.

### SECOND CAUSE OF ACTION
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff and the Do No Call Registry Class)**

105.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

106.    47 U.S.C. § 227(c) provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.

107.    The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential

telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

108.    47 C.F.R. § 64.1200(e), provides that § 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,'" which the Report and Order, in turn, provides as follows:

> The Commission's rules provide that companies making telephone solicitations to residential telephone subscribers must comply with time of day restrictions and must institute procedures for maintaining do-not-call lists. For the reasons described above, we conclude that these rules apply to calls made to wireless telephone numbers. We believe that wireless subscribers should be afforded the same protections as wireline subscribers.

109.    47 C.F.R. § 64.1200(d) further provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

> (1) Written policy. Persons or entitles making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

> (2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

> (3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to

27

receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request . . . .

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

110.    Defendant violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to cellular telephone subscribers such as Plaintiff and the Do Not Call Registry Class members who registered their respective telephone numbers on the National Do Not Call Registry, a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government. These consumers requested to not receive calls from Defendant, as set forth in 47 C.F.R. § 64.1200(d)(3).

111.    Defendant also violated 47 C.F.R. § 64.1200(d) by failing to have a written policy of dealing with do not call requests, by failing to inform or train its

28

personnel involved in any aspect of telemarketing regarding any do not call list, and by failing to record and honor do not call requests.

112.    Defendant placed more than one unsolicited telephone call to Plaintiff and members of the Do Not Call Registry Class within a 12-month period without their prior express consent to receive such autodialed or pre-recorded calls. Plaintiff and members of the Do Not Call Registry Class never provided any form of consent to receive autodialed or pre-recorded calls from Defendant, and/or Defendant does not have a current record of consent to place autodialed or pre-recorded calls to them.

113.    Defendant violated 47 C.F.R. § 64.1200(d) by initiating calls for telemarketing purposes to residential and wireless telephone subscribers, such as Plaintiff and the Do Not Call Registry Class, without instituting procedures that comply with the regulatory minimum standards for maintaining a list of persons who request not to receive telemarketing calls from them.

114.    Defendant violated 47 U.S.C. § 227(c)(5) because Plaintiff and the Do Not Call Registry Class received more than one autodialed or pre-recorded call in a 12-month period made by or on behalf of Defendant in violation of 47 C.F.R. § 64.1200, as described above. As a result of Defendant's conduct as alleged herein, Plaintiff and the Do Not Call Registry Class suffered actual damages and, under section 47 U.S.C. § 227(c), are each entitled, *inter alia*, to receive up to $500 in damages for such violations of 47 C.F.R. § 64.1200.

115.    To the extent Defendant's misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages recoverable by the members of the Do Not Call Registry Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Shari Lindenbaum, individually and on behalf of the Classes, prays for the following relief:

1.      An order certifying this case as a class action on behalf of the Classes as defined above; appointing Plaintiff Lindenbaum as the representative of the Classes and appointing her attorneys as Class Counsel;

2.      An award of actual or statutory damages, whichever is greater, all to be paid into a common fund for the benefit of the Plaintiff and the Classes;

3.      An order declaring that Defendant's actions, as set out above, violate the TCPA;

4.      A declaratory judgment that Defendant's telephone calling equipment constitutes an automatic telephone dialing system under the TCPA;

5.      An order requiring Defendant to disgorge any ill-gotten funds acquired as a result of its unlawful telephone calling practices;

6.      An order requiring Defendant to identify any third-party involved in the autodialed and/or prerecorded calling as set out above, as well as the terms of any contract or compensation arrangement it has with such third parties;

7.      An injunction requiring Defendant to cease all unsolicited autodialed and/or prerecorded calling activities, and otherwise protecting the interests of the Classes;

8.      An injunction prohibiting Defendant from using, or contracting the use of, an automatic telephone dialing system without obtaining, and maintaining records of, call recipient's prior express written consent to receive calls made with such equipment;

9.      An injunction prohibiting Defendant from contracting with any third-party for marketing purposes until it establishes and implements policies and procedures for ensuring the third-party's compliance with the TCPA;

10.      An injunction prohibiting Defendant from conducting any future telemarketing activities until it has established an internal Do Not Call List as required by the TCPA;

11.      An award of reasonable attorneys' fees and costs to be paid out of the common fund prayed for above; and

12.      Such further and other relief as the Court deems necessary.

### JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**SHARI LINDENBAUM**, individually and on behalf of a Class of similarly situated individuals

Dated: September 22, 2017           By:   /s/Adam T. Savett
                                                        One of Plaintiff's Attorneys

Adam T. Savett (VA73387)
adam@savettlaw.com
Savett Law Offices LLC
2764 Carole Lane
Allentown PA 18104
Telephone: (610) 621-4550
Facsimile: (610) 978-2970

Attorneys for Plaintiff and the Putative Classes